## TURBEVILLE v. FLOWERS.

1. In the partition of an intestate's lands one tract was assigned by the commissioners to the widow. All parties agreed that this assignment should be disregarded and this tract sold along with two others, and it was purchased by the second husband of this widow, it being about her share, he giving his bond for his bid. One of the other purchasers failed to comply and the tract purchased by him was afterwards sold for a less amount. *Held* (the widow consenting that her husband's bond should be credited with her share), that such share was a third of the money realized from the sales, and not a third of the amounts for which the land was first sold.

2. The assets of an intestate's estate cannot properly be distributed amongst the heirs at law and distributees, and their shares therein properly ascertained, until the same are converted into money or what the parties may accept as money.

3. Distributees of an estate are chargeable with interest on their purchases of real and personal property from the date of purchase until payment.

4. An administrator is liable for Confederate money properly received by him where he fails to show that it perished on his hands.

5. An administrator is liable for uncollected notes taken at a sale made by him during the war, where he fails to show that they could not have been collected.

6. A question (other than one of jurisdiction) not presented to or passed upon by the Circuit Court, cannot be considered here.

Before COTHRAN, J., Marion, October, 1886.

This was an action by Willis Turbeville and wife against the other distributees of Richard Brown, deceased, to which action C. D. Evans, administrator, was afterwards made a party plaintiff. The opinion sufficiently states the case.

*Messrs. C. D. Evans* and *Jos. T. Walsh,* for appellants.

*Mr. W. J. Montgomery,* contra.

October 6, 1887. The opinion of the court was delivered by

MR. JUSTICE MCIVER. On or about January 1, 1864, Richard Brown departed this life intestate, leaving as his heirs at law his widow, Mary, who has since intermarried with the plaintiff, Willis Turbeville, and a number of children and grandchildren, whose names may be found in the record. The intestate at the time of his death was seized and possessed of three tracts of land and some personal property, administration of which was duly committed to C. D. Evans, Esq., then commissioner in equity, as a derelict estate, under the provisions of the act of 1857. In the fall of the year 1864, the administrator made sale of the personal property, which was bought principally by some of the distributees, though some of them bought nothing at the sales of the personalty.

On January 4, 1867, a bill in equity was filed by the plaintiffs, calling upon the administrator to account and asking for partition of the real estate. Accordingly an order was granted that a writ of partition do issue and that the administrator do account. The commissioners made their return, recommending that one of the tracts of land be set apart to the widow of the intestate, then the wife of plaintiff, Turbeville, and that the other two tracts be sold for distribution. Some dissatisfaction having arisen amongst the other heirs at law at this arrangement, Willis Turbeville and wife, on December 2, 1867, executed a paper, a copy of which is set out in the record, whereby they formally waived the assignment of one of the tracts of land to Mary Turbeville as her portion, and consented that all three of the tracts should be sold on the terms recommended by the commissioners in partition, and on December 11, 1867, an order was granted by the Court

of Equity, upon the motion of the attorneys for the plaintiffs, confirming the return of the commissioners, except so much thereof as assigned one of the tracts of land to the plaintiff Mary, and directing that all three of the tracts be sold on the terms specified.

In pursuance of this order the three tracts of land were offered for sale on the first Monday in January, 1868, when tract marked A was bid off by A. H. Ford, tract B by Robert Collins, and tract C by the plaintiff, Willis Turbeville. Ford complied with the terms of sale, and has paid his bond for the purchase money in full. The bond of Turbeville still remains unpaid as part of the assets of the estate of Richard Brown for distribution. Collins, the other purchaser, though he never complied with the terms of sale, and never paid any part of the purchase money, except three bales of cotton delivered to the administrator (when, does not appear), went into possession, and he and those to whom he sold continued to occupy the tract of land, until a resale was made in 1879—eleven years after the first sale—at which resale one Thomas Collins became the purchaser, complied with the terms of sale, and paid the purchase money to the master. No further step appears to have been taken in the case until March 28, 1873, when an order was granted by the court, on the motion of the attorney for plaintiffs, for the distribution of the funds in the hands of the clerk of the Court of Common Pleas amongst several of the heirs named in the record, but not including the plaintiff Mary. After this the case rested until October 12, 1883, when, on motion of the attorneys for plaintiffs, and with the consent of W. J. Montgomery, Esq., who had in the meantime been employed to represent certain of the heirs of Richard Brown, and with the consent of C. D. Evans, Esq., administrator, an order was granted reviving the action, giving leave to amend the complaint, bringing in certain infant distributees as parties, and allowing the administrator to account.

On April 30, 1886, another order was passed referring all the issues of law and fact to J. D. McLucas, Esq., as special master, with leave to report any special matter. In pursuance of this order the special master made his report, in which, after stating the facts hereinbefore substantially set forth, together with other

matters which do not now appear to be in dispute, accompanied with statements of the accounts of the several parties, including that of the administrator, showing the balances due to and by them respectively, recommends the adoption of the same by the court. To this report exceptions were filed by the plaintiffs, as well as by Mr. Evans, as administrator.

The Circuit Judge overruled all the exceptions and rendered judgment confirming the report, and from this judgment the same parties appeal upon the following grounds: "1. That the plaintiff, Mary Turbeville, *née* Mary Brown, her husband, Willis Turbeville, joining her, having waived her right, her husband joining her, to the assignment of the tract to her made by the commissioners in partition as the widow of Richard Brown, and consenting to a sale thereof by the commissioner in equity, A. D. 186  , the said Mary Turbeville was entitled, as of the day of sale, of all the real estate of Richard Brown, to wit, the 2nd of January, 1868, to her distributive portion, one-third of the proceeds of the sale of the three tracts of land; and also having assignments of John Brown and    Brown, heirs at law of Richard Brown, which aggregate a sum of money exceeding the amount of the bond conditioned for the payment of eleven hundred and fifty-six dollars, she is entitled to have the bond delivered up to be cancelled; and the balance due them on assignment to be paid them of the fund in hand; and that the cumulation of interest as reported by the master is unjust and inequitable."

The exceptions of Mr. Evans, as administrator, are as follows: "1. That he is charged with two hundred and fifty-nine 12–100 dollars, cash received in Confederate currency, which perished in his hands. 2. That he is charged with notes for purchases at sale, viz., W. W. Durant, $196; J. A. Parham, $210; A. Robbins, $186, = $592; aggregating five hundred and ninety-two dollars, which, on account of the disordered state of the times in 1865, and the absence of courts, could not be collected; and on the expiration of his term of office in 1865 were turned over to his successor in office. 3. That he is charged with seventy-five dollars as money received for the estate of Richard Brown, when in fact the said money was for taxed costs in the foreclosure of

mortgage against Robert Collins, a purchaser of one of the tracts of land of estate Richard Brown, and which charge against C. D. Evans, as administrator, is unsustained by a particle of testimony."

The special master in his report calculates interest on the amount of the purchases made by the several heirs at the sale of the personalty, as well as interest on the amounts heretofore paid to some of the heirs up to June 30, 1886—the day to which the report was made up—as well as interest on the bond of Turbeville to the same date, and after eliminating therefrom the amounts which had been thus received by three of the children and two of the grandchildren, who appear to have been overpaid, he adds up the several sums thus obtained, together with the cash in the hands of the master, arising from sales of the real estate, and .regards the amount thus arrived at as representing the total assets of the estate now remaining for distribution, of which sum the widow, Mary Turbeville, would have been entitled to one-third, and the remaining two-thirds would have been divisible amongst the other heirs, who had not been overpaid, in the proportions to which they were severally entitled, but the widow having received, by her purchases at the sale of the personalty as well as the real estate, more than her third, she becomes indebted in the amount stated in the report, and as most of the other heirs have also received portions of their shares by purchases at the sale of the personalty or by cash heretofore paid them by the clerk or by the master, they are now only entitled to receive the several balances set forth in the report, while the one who has heretofore received nothing from either of these sources is now entitled to his full share as thus ascertained and set down in the report. Why the amounts overpaid to some of the heirs should have thus been eliminated, does not appear, and by what authority the share of the widow was set off against the amount of her husband's bond given for the real estate, has not been made to appear. But as no controversy seems to have been raised, either in the court below or here, as to either of these matters, these questions are not before us and will not be considered, but we will confine our attention to the questions raised by the exceptions or grounds of appeal.

The gravamen of the complaint on the part of Turbeville and wife seems to be that there was error in the time resorted to for the purpose of ascertaining the amount of the widow's share, they claiming that the same should have been ascertained at the time of the sales by setting apart to her one-third of the amount thereof, as a credit on her purchases (as it is termed) at the time of the sales. The fallacy of this claim is manifest from the facts which have occurred in this very case. The amount for which the land was bid off at the first sale was three thousand and thirty-six dollars, but by reason of the failure of one of the bidders to comply with the terms of the sale, a resale of one of the tracts became necessary, which, for some unexplained reason, did not take place until about eleven years afterwards; and at this sale the tract sold for less than the amount bid for it at the first sale, and under the view contended for by appellants, the loss thereby sustained, as well as the loss of the interest thereon for the intervening eleven years, would fall entirely upon the other heirs, who certainly were in no way responsible for the causes producing such a loss. This would be manifestly inequitable, and contrary to the rules and practice of the court in making distribution of an intestate's estate. The assets of such an estate cannot properly be distributed amongst the heirs at law and distributees, and their shares therein properly ascertained, until the same are converted into money, or what the parties may accept as money.

As is said by Harper, Ch., in *Gillett* v. *Powell, Speer Eq.*, 149–50 (the italics being ours), in speaking of a case where real and personal estate had been sold for a division, at which some of the heirs made purchases, giving their bonds for the amounts of such purchases, under an agreement between some of the parties that the bonds so given were not to be paid, but upon a final settlement of the estate should be cancelled: "I have no doubt but that partition might be made in this way, if the distributees of an estate should purchase to about the amount of their shares, give their bonds for the amount, and then these bonds should be settled, each receiving or paying whatever amount his purchase might exceed or fall short of his share (for it is hardly possible that each should purchase to the exact amount of his share), and the bonds then cancelled. *But until such settlement and cancel-*

lation, there could be no distribution. *Until then they would be liable on their bonds in case of any unexpected debt arising, or for any balance exceeding or falling short of their shares. In contemplation of law it is not the property (of which they are merely purchasers, as any other individuals would be), but the money, secured by the bonds, which is the subject of partition."*

Now, if this be true of a case where there was an agreement between some of the parties that partition should be effected in that way, how much more true would it be in a case like the present, where there is no evidence whatever of any such agreement. The case of *Huson* v. *Wallace* (1 *Rich. Eq.*, 1), relied on by appellants, is in no wise in conflict with this view. There *actual* partition had been made in 1831, and the return was confirmed nunc pro tunc in 1835, and the court held that the order confirming the return had relation back to the actual partition, vesting the legal title in the wife from that time, upon which the marital rights of the husband attached, though the wife had died before the date of the order confirming the return.

The bond of Willis Turbeville, given for the purchase money of the tract of land bid off by him, represented a debt due by him to the estate, and as such constituted a part of the assets of the estate, in which all of the heirs were entitled to share, and cannot be regarded as representing his wife's share. Indeed, if the wife had been so minded, she might have declined to allow that bond, or any portion thereof, to be set off against her share of the estate. *Roberts* v. *Adams*, 2 *S. C.*, 337 ; *Farrow* v. *Farrow*, 12 *Id.*, 168 ; *Kennedy* v. *Budgett*, 19 *Id.*, 591. But we do not understand that Mrs. Turbeville takes any such position, but, on the contrary, she insists, as she has a right to do, being now, to some extent at least, *sui juris*, that her share of the estate should be set off against the debt due by her husband, only contending that there has been error in ascertaining the amount of her share and crediting the same on the debt at the proper time. The fact that the commissioners in partition recommended that the tract of land, afterwards purchased by her husband, should be assigned to Mrs. Turbeville as her third of the real estate, cannot affect the question. No such assignment was ever made ; but, on the contrary, it was expressly waived by both Turbeville and wife,

who, in writing, consented that this tract of land should be sold along with the others, whereby she became entitled only to her share of the proceeds of the sales of the land, and not to the land itself, whenever the same should be realized. The practical effect was the same as if the commissioners in partition had, in their return, recommended a sale of all three of the tracts, for the order of sale which was made, was in effect an amendment of the return to that end, which was made by the consent in writing of both Turbeville and wife, sanctioned by the court.

As to that portion of the exception of these appellants which speaks of assignments from two of the heirs, held by Mrs. Turbeville, we find no foundation for it in the facts stated in the "Case." There is no evidence, so far as there appears, of any such assignments, and hence there is nothing upon which this part of the exception can be founded.

As to the last portion of the exception, which complains of the "cumulation of interest," besides the fact that it is not presented as required by the rules of this court, being too general in its form to require any notice, we see no ground for it even as explained in the argument. The amounts of the purchases at the sales. both of the real and personal estate, constitute debts due to the estate, and, of course, must bear interest until they are paid or otherwise settled; and as they never have been paid or otherwise settled, it was manifestly correct to compute the interest thereon, as has been done by the master. Of course, the widow is entitled to her share of the "cumulation of interest," and this has been allowed her, but the other heirs are alike entitled to their share thereof, and that has been properly allowed them.

Next, as to the exceptions filed by the administrator. It does not appear that he ever made any returns, or that he kept any detailed account of his receipts and disbursements on account of the estate committed to his charge. This latter omission, however, may be accounted for by the testimony of the administrator, that "most of the memoranda and papers of the estate were destroyed" when his office was burned in February, 1870. In this condition of things the special master states that he made up this account from a statement rendered by the administrator, which not being full, he supplemented it by the records and

vouchers found in the case. We are unable to find any testimony upon which the first and second exceptions of the administrator can be based. It is true, that in the statement rendered by the administrator from memory, he claims to have received the amount mentioned in the first exception in Confederate money, although the terms of the sale required that good money should be paid, yet it does not appear that any portion of it "perished on his hands." On the contrary, it appears from the same statement that a portion of it, at least, was paid out. So that even conceding that the administrator may have been justified in receiving Confederate money, because, as he says in his argument, though the fact does not appear in the testimony, the terms of sale required that all sums of and under twenty dollars should be paid in cash, which necessarily implied Confederate money, yet, as we are unable to find any evidence whatever that the sum claimed, or any other sum, "perished on his hands," but, on the contrary, do find that a portion of the sum received was paid out, we do not see how this exception can be sustained.

So, too, as to the second exception filed by the administrator, there is no testimony to sustain it. Indeed, it does not appear very distinctly that the administrator ever took any such notes as are there mentioned. True, it does appear that the persons named in this exception were purchasers at the sale, but the amounts of their purchases do not, in one instance at least, correspond with the amount of the note, as stated in the exception, but as the other two do correspond, this discrepancy may be owing to a misprint. Assuming that this is so, and that the administrator, as we are disposed to believe, did actually hold such notes, we look in vain for any testimony tending to show that these notes could not have been collected.

As to the third exception, it is sufficient to say that no such exception was taken in the court below, and therefore it cannot be considered here. Our province is to review the action of the Circuit Court, and therefore a question not presented to or passed upon by the Circuit Court, except a question of jurisdiction, we have no authority to determine.

The judgment of this court is, that the judgment of the Circuit Court be affirmed.